IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GARDNER V. GARDNER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

VERNON C. GARDNER, APPELLEE,

V.

SHAWNNA S. GARDNER, APPELLANT.

Filed August 14, 2018.    No. A-17-1055.

Appeal from the District Court for Garden County: DEREK C. WEIMER, Judge. Affirmed.

Jason A. Ossian and Kirk M. Fellhoelter, of Douglas, Kelly, Ostdiek, Snyder, Ossian, Vogl & Snyder, P.C., for appellant.

Rhonda R. Flower, of Law Office of Rhonda R. Flower, for appellee.

PIRTLE, RIEDMANN, and WELCH, Judges

RIEDMANN, Judge.

## INTRODUCTION

Shawnna S. Gardner appeals the order of the district court for Garden County, which dissolved her marriage to Vernon C. Gardner; divided the marital estate; and awarded custody, visitation, and child support regarding the parties' two minor children. On appeal, she argues that the district court abused its discretion in awarding physical custody of the children to Vernon. We find no abuse of discretion and therefore affirm.

## BACKGROUND

Vernon and Shawnna were married in 1996. They adopted two children during the marriage: James, born in 2004, and Luke, born in 2007. The parties eventually separated, and Vernon filed a complaint for dissolution of the marriage in January 2016.

The district court entered a temporary order in August 2016 awarding temporary legal and physical custody of the children to Shawnna. Despite this, the court expressed concern about Shawnna's desire to move the children to a new school district, thereby removing James from the only school that he had known and the teachers and staff that were aware of and had worked at addressing his educational needs. The court found that Shawnna's choices regarding James' attendance and participation in class were concerning as well, and although Shawnna was certain that the new school district would better meet James' needs, the court observed that that "will be demonstrated over time."

The dissolution trial was held in July 2017. The evidence revealed that Vernon and Shawnna adopted both boys when they were babies, and Shawnna stayed home to care for them. At that time, the family lived on a ranch and Vernon worked on the ranch. Vernon struggled with an alcohol addiction during the marriage that led to his family and friends staging an intervention in 2015. Thereafter, he completed a treatment program in Kansas. He testified at trial that since returning from treatment, he has maintained his sobriety, and that he was confident he could continue to do so. Shawnna, on the other hand, believed that Vernon had not successfully completed treatment and never stopped drinking.

Other witnesses supported Vernon's claim that he was sober. The principal of the school the boys attended for the 2015-16 school year as well as James' teacher testified that they never observed anything that year that would indicate that Vernon was continuing to drink. Similarly, the principal at Creek Valley, the school the boys attended in 2016-17, and James' teacher there each stated that they never saw any indication that Vernon was under the influence of alcohol during that school year. Likewise, two of Vernon's friends and Vernon's brother, all of whom participated in the intervention, testified that they had regular contact with Vernon after he returned from treatment and that they had not seen any signs he was continuing to drink alcohol.

In addition to struggling with alcoholism, Vernon was diagnosed with lupus around 2011. There is no cure for lupus, but treatment is available for the symptoms. Vernon testified that he had been taking medication, but it was not very effective so he stopped taking it, and now he is able to control the symptoms fairly well by getting sufficient sleep and reducing stress. He said his condition does not prevent him from working or taking care of the children.

At the time of trial, Vernon was living in a two-bedroom house on 50 acres of land. The property also has a horse pasture and several outbuildings. The boys share a room when they stay with him. Vernon's job history is in rodeo and ranching, but at the time of trial, he was not permanently employed. Instead, he supported himself by doing day work and odd jobs. He explained that he does not earn much money, but he is able to control his schedule so he can be available for the children. At that time, he was also enrolled in a certification program with the National Association of Corrosion Engineers. Once he becomes certified, there are job opportunities in his area which earn around $52,000 per year and would allow him to care for the children on a full-time basis. Vernon admitted that during the marriage, he worked outside quite a bit, but as the boys got older, his role evolved. He testified that during the last year of the marriage, he was the parent who would wake the boys up in the morning, feed them breakfast, and take them to school and sometimes pick them up as well.

Shawnna was a stay-at-home mother when the children were young, but her work history is in teaching. She returned to substitute teaching in 2010. She obtained a full-time teaching

position at Creek Valley High School for the 2016-17 school year. As a teacher, she was also required to coach the speech team, direct a one-act play, and work on the yearbook. Shawnna explained that she decided not to renew her teaching contract in Creek Valley after 1 year because of the requirement that she assist with extracurricular activities in addition to teaching. It was difficult for her to juggle her employment responsibilities and be there to help James with his academic needs, so she elected to look for a different teaching position. She accepted a teaching position in Columbus, Nebraska, for the 2017-18 school year. Columbus is approximately 300 miles from the community in which she, Vernon, and the children had resided.

The evidence presented at trial revealed that Luke had just completed third grade and was an easygoing, "happy-go-lucky" child who excelled socially and academically. Thus, the majority of the evidence presented surrounded James and his educational needs. The boys attended school in the Garden County school system until the 2016-17 school year, when Shawnna moved them to Creek Valley. This was the move about which the district court expressed concern in its temporary order in this case. James struggled in school and had an individualized education plan (IEP), which allowed various accommodations for him during school. He has been diagnosed with attention deficit hyperactivity disorder (ADHD) and was taking medication for it during the 2016-17 school year, which was his sixth grade year, but according to Shawnna, he was experiencing side effects so she unilaterally decided to discontinue his medication. Vernon believed there were other explanations for any possible side effects and did not agree with the decision to discontinue James' medication.

During James' sixth grade year, the school allowed him to use his cell phone to call home, particularly to talk to Shawnna, when he was feeling extreme anxiety. After a while, school officials began to believe that James was manipulating the privilege to call home just before math class or when he did not have his homework done, and it appeared to become an avoidance behavior. They discussed the issue with Vernon and Shawnna, and Shawnna wanted him to be permitted to call her whenever he wanted to call. However, this appeared to exacerbate the issue because James would become more heightened in his anxiety, pleading, crying, and nervousness, and it did not appear to remedy the situation or calm him down. At times, James would ask Shawnna to pick him up from school, and she would do so; as a result of the phone calls and missed classes, he began to fall behind in math and had difficulty catching up.

The evidence revealed other instances where Shawnna appeared not to prioritize James' school work. On the day of state-mandated standardized testing, James left his test and called home. Shawnna came to pick him up during the test and said that she did not care about the test and that he did not have to take it. James' math teacher began working with him before school or during lunch to help him with his assignments, but Shawnna elected to discontinue those sessions because she believed that James needed that time to be social with his friends more than he needed to be pulled out to do work.

At the end of the sixth grade school year, James was at risk of failing math. So Vernon and the school arranged for him to work with a tutor throughout the summer to complete his work in order to pass the class, but Shawnna was opposed to James doing so. On the last day of school, James stayed inside during the school's field day in order to complete some of his assignments, but Shawnna came to the school and allowed him to go outside rather than complete his work.

The Garden County principal and superintendent testified that she always felt as though Vernon was very willing to offer his opinion but was willing to listen as well, and he was respectful and polite and expected the same from his children. However, she opined that the school's relationship with Shawnna began deteriorating once James' phone calls became an issue and his anxiety appeared to heighten. She additionally believed that James' homework was not completed because Shawnna was not holding James accountable. She did not get the same feeling from Vernon in terms of holding James accountable and said that Vernon seemed to grasp the importance of James getting an education and was supportive of the school's efforts to work with James. Similarly, James' sixth grade homeroom and math teacher emphasized the importance for staff and parents of a child with an IEP to be on the same page and work together. She felt that she was on the same page as Vernon with respect to James' education, but by the end of the year, she did not feel as though she had that same support from Shawnna. James ultimately failed sixth grade math.

For his seventh grade year, James attended Creek Valley Public Schools and continued to struggle; his behavior issues were difficult throughout the year, which also affected his academics. His seventh grade teacher testified that James needs consistency and someone who will be firm with him and stand their ground. The school had meetings with Vernon and Shawnna and it seemed as though they were all on the same page regarding James, but according to James' teacher, she felt as though Shawnna did not follow through. James struggled to consistently complete his homework, so eventually, when it was Vernon's weekend with the boys, he would have the school collect all of James' homework and he would pick it up from the school. On Saturday mornings, he and James sat at the kitchen table until James finished his homework. Vernon explained that the first weekend it took James 2½ hours to finish, but after that, it took no more than 30 minutes to have him caught up every Monday. Thereafter, James' homework would be complete when he came to school after being with Vernon, but the weekends he was with Shawnna, his homework was complete only approximately 50 percent of the time. Unfortunately, James failed seventh grade math, science, and history, but was allowed to move on to eighth grade.

Vernon explained at trial that he has been extremely worried about James' academics. He admitted that he and Shawnna disagreed because he believed the school was doing what it thought was best for James, but she thought the school was picking on James. Vernon did not agree with letting James call home and allowing Shawnna to pick him up; instead, he believed they should work to figure out why James wanted to call home and figure out how to solve the issue so he would not miss school. He also disagreed with Shawnna's decisions to discontinue James' ADHD medication, buy James a second cell phone after the school required him to leave his cell phone in the office, move him from Garden County to Creek Valley for seventh grade, and allow him to participate in field day rather than completing his school work. Vernon was not in favor of allowing the children to move to Columbus with Shawnna and would prefer they remain in their same school with their same friends. He opined that it would be in the children's best interests to be placed in his custody; he had concerns about James' education when he was with Shawnna because James is getting older and falling farther behind, and it is unknown whether he could succeed in another new school system.

Correspondingly, Shawnna believed that placing custody with her was in the boys' best interest, because she has always been their primary caretaker and they have always been her first

priority. She asked that the boys be allowed to move with her to Columbus, where she had obtained a three-bedroom apartment. James would attend the same school where Shawnna will teach, and Luke would attend the elementary school, approximately 5 minutes away. She believed that a bigger city like Columbus could offer James more support services and programs than those available in western Nebraska. She opined that James' struggles escalated during his seventh grade year because the divorce was very difficult on him, and she was teaching and helping with extracurricular activities so she was not as available to help James as she had previously been. She arranged for James to begin working with a counselor and helped him work with an assignment notebook and constantly checked in to keep him accountable.

The district court entered a decree on August 7, 2017, which dissolved the parties' marriage. A supplemental order was entered addressing the issues of property division, custody, visitation, and child support. Relevant to this appeal, the order thoroughly discussed the applicable factors related to a custody award and ultimately concluded "in this instance and based on the specific facts of this case" that the children's best interests would be served by awarding the parties joint legal custody and awarding Vernon physical custody. Shawnna was awarded parenting time every other weekend. She also received summer parenting time commencing on the first Friday after the conclusion of the school year until 14 days before the start of the following school term. Shawnna appeals.

## ASSIGNMENTS OF ERROR

Shawnna assigns that the district court abused its discretion in its award of custody, visitation, and child support.

## STANDARD OF REVIEW

An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, and alimony. *Id.*

## ANALYSIS

Although Shawnna assigned error with respect to the district court's award of custody, visitation, and child support, she argues only that the court abused its discretion in awarding custody of the children to Vernon. Because alleged errors must be both specifically assigned and specifically argued in the brief of the party asserting the error, we decline to address the issues of visitation and child support. See *Burcham v. Burcham, supra* (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

Shawnna argues that the district court abused its discretion in awarding custody of the minor children to Vernon because the court improperly applied the best interest standard, and the evidence establishes that it would be in the children's best interest to be placed in her custody. We find no abuse of discretion.

When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests.

*Burcham v. Burcham, supra*. See Neb. Rev. Stat. § 42-364(2) (Reissue 2016). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Burcham v. Burcham, supra*. There are no allegations or findings of unfitness in the present case, and we therefore consider the children's best interests.

The best interests of the child require a parenting arrangement and parenting plan which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children. Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). Section 43-2923(6) requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

See, also, *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Id.*

In the present case, the district court considered all of the foregoing factors and concluded that four factors weighed in favor of Vernon, three factors weighed in favor of Shawnna, and five factors were not in favor of either parent. Shawnna contends that several of the court's findings constitute an abuse of discretion.

She first asserts that the court abused its discretion in finding that the general health, welfare, and social behavior of the children weighed in favor of placing custody with Vernon. In considering this factor, the court's order expressed concern about Shawnna's actions related to James, particularly with respect to James' education. The court noted that when James is pushed, he retreats to Shawnna and she insists that the school, rather than James, make changes; that Shawnna unilaterally decided to discontinue James' ADHD medication; and that she has repeatedly moved James to a different school.

Shawnna argues that she was the primary parent for the children, and she actively participated in their activities and events. She also notes that she is moving to Columbus so that she can work a full-time teaching position but still have the ability to be with the boys after school.

We do not disagree with the facts Shawnna highlights, but she did not address the court's biggest concern regarding this custody factor, which is her actions with respect to James'

education. She purchased two cell phones for James and encouraged him to call her if he was struggling while at school, a privilege which the school officials came to realize James was abusing and using to get out of math class. And when James would call her, Shawnna would pick him up from school, resulting in him missing additional classes and falling farther behind. Vernon, on the other hand, did not believe in allowing James to leave school early and wanted to determine the cause of the issue that resulted in James continuously calling home during the day. Further, the evidence established that James' homework was completed approximately half of the time when he was with Shawnna whereas it was generally always done after he spent the weekend with Vernon. And Vernon emphasized James completing his school work over participating in field day and working with a tutor during the summer, decisions to which Shawnna objected. The evidence also established that Vernon was generally cooperative and "on the same page" as the school officials with respect to James' education, but the same could not always be said for Shawnna, particularly towards the end of James' sixth grade year.

As the court and the parties recognized, James' education was a great concern. He failed his math class in sixth grade and seventh grade and failed two additional core classes in seventh grade. The court expressed reservation about allowing James to move to Columbus with Shawnna which would require that he attend his third school in 3 years, citing its previous concern about allowing Shawnna to move James to a new school for seventh grade, a decision that did not pan out as well as hoped. Based on James' heightened educational needs and the fact that Vernon appears better able to hold James accountable, we cannot find that the court's conclusion regarding this custody factor constitutes an abuse of discretion.

Shawnna additionally challenges the district court's finding that the respective environments offered by each parent weighed in favor of Vernon. The district court found this factor difficult to fully analyze due to the transience of Shawnna's housing situation, but it recognized that Shawnna was in the process of relocating to Columbus, where she had acquired a three-bedroom apartment which was close to the schools the boys would attend. The court also observed that Vernon resides in a rural residence outside of Big Springs, Nebraska, in a home with sufficient room for Vernon and the boys, as well as space for the boys' horses on the property. The court also noted that Vernon had stopped working full time during the dissolution proceedings and accumulated considerable credit card debt to finance his expenses. "Due primarily to the transitional nature of [Shawnna's] current living and employment situation and relative lack of evidence about the home in which the boys would be residing in Columbus," however, the court found that this factor weighed in favor of Vernon.

Shawnna argues that her situation is the opposite of transitory, notes Vernon's lack of steady employment, and emphasizes Vernon's history of alcohol abuse. We find no abuse of discretion in weighing this factor in favor of Vernon.

In support of its characterization of Shawnna's situation as "transitional," the court observed that Shawnna has worked in a number of different school systems, including three different districts in the last 3 years. Not only has Shawnna's employment moved to different school districts, she moves the boys to different schools along with her. And this time, she is moving 300 miles away from the community in which the boys have always lived. If the boys were to move with her, this would result in their attending a third school in as many years;

attending a much larger school district than that to which they are accustomed; and moving James away from his friends, teachers who are familiar with his needs, and his counselor.

With respect to Vernon's use of alcohol, the evidence presented at trial recounted numerous incidents prior to the time he attended treatment in early 2015. Although Shawnna testified that she believed Vernon continued to drink alcohol after completing treatment, she cited no specific instances or evidence to support her suspicions, and all other witnesses who had interacted with Vernon after he returned from treatment testified that they saw no indication that he continued to drink. As a result, we find no merit to Shawnna's argument regarding this custody factor.

Shawnna next alleges that the district court abused its discretion in concluding that the age, sex, and health of the children and parents did not weigh in favor of one parent over the other. She argues that the court inappropriately disregarded Vernon's lupus diagnosis and alcoholism.

At trial, Vernon explained that he had been diagnosed with lupus 6 years earlier. He said that there is no treatment for lupus, but he is able to control his symptoms fairly well by getting sufficient sleep and reducing stress. He testified that his condition does not prevent him from working or taking care of the children. Shawnna attempts to link Vernon's diagnosis with his employment status, but there was no evidence that his lupus symptoms prevented him from working, and he testified to the contrary. In addition, as we observed above, the record is replete with evidence of the effects of Vernon's alcohol abuse prior to 2015, but there was no evidence to support a finding that he continued drinking after completing treatment.

For the sake of completeness, we observe that the district court also found that the boys were healthy and active, Vernon and Shawnna were both in their fifties, and Shawnna is a cancer survivor who has been cancer-free for a number of years. We conclude that the court's determination that none of the evidence surrounding this factor causes concern about the parties' ability to care for the children was not an abuse of discretion.

Shawnna additionally claims that the court abused its discretion in determining that the factor regarding the effect on the children as a result of continuing or disrupting an existing relationship weighed in Vernon's favor. She again notes that she was the boys' primary caregiver and opines that removing them from her care would have a serious detrimental effect on James and put both boys' safety in jeopardy.

In addressing this factor, rather than focus on Vernon and Shawnna personally, the district court focused on relocating the children to Columbus, approximately 300 miles away from their current home. The court found that the boys have friendships and relationships in their current community, and there are advantages for James to remain in the school system with those who are familiar with him and his needs, as well as remaining close to his current therapist, which is, presumably, a positive relationship for James. Thus, the court found that the relocation would disrupt all of the relationships that the children have built up until this point. The evidence presented at trial repeatedly emphasized the need for consistency and stability for James. As the district court observed, the "fresh start" Shawnna sought by moving the boys from Garden County to Creek Valley did not turn out as well as everyone hoped, but that transition was not as disruptive as the move to Columbus would be because the distance between the Garden County and Creek Valley communities is less than 40 miles.

Accordingly, the question under this factor in the instant case is not whether the children's best interests will be served by living with Vernon or Shawnna, but, rather, whether it is in their

best interests to move 300 miles away or remain in their current community. And by remaining in their current community and school district, James will have consistent help at school from those who are familiar with him and his educational needs. In addition, Vernon has a good working relationship with the teachers and school officials and has been able to provide the oversight needed to ensure that James completes his homework and gets any additional help he needs to pass his classes. As a result, we find no abuse of discretion with respect to this factor.

Shawnna next contends that the district court abused its discretion in determining that the attitude and stability of each parent's character did not weigh in favor of one parent over the other. She again highlights Vernon's history of drinking, as well as his unemployment, living alone on a rural property, and refusing any alcohol or lupus treatment.

In its order, the district court found that this factor could be difficult to define, but it noted concerns regarding Vernon's alcoholism and Shawnna's enabling of James. However, notwithstanding these issues, the court found both parties to be well-meaning and devoted to the children, observing that through the profound changes the family has endured, both parents maintained their efforts to do what they believed was "right" for the boys, which reflects well on their attitudes and character.

We again observe that there was no evidence other than Shawnna's suspicions that Vernon continued to drink after completing treatment. In fact multiple witnesses testified that there was no indication he was drinking, nor was there any evidence that his rural residence or lupus had any impact on his ability to parent the children. To the contrary, Vernon's property had sufficient room for the boys' horses and allowed for activities such as fishing.

It was clear from trial, as the district court observed, that both parents have done their best to care for the children, despite disagreeing with each other's methods at times. Specifically, with respect to James, each party has made decisions it believed at the time to be in James' best interests, which reflects well on their parenting abilities as the district court concluded. We therefore find that the district court's determination that this factor did not weigh in favor of either parent was not an abuse of discretion.

Finally, Shawnna asserts that the district court's finding that the parental capacity to satisfy the educational needs of the children weighed in Vernon's favor was an abuse of discretion. The district court found this factor to be "critical" in this case and determined that both parents have demonstrated a capacity to provide physical care for the children, but here, "[t]he issue of educational needs is powerful." Noting that Luke was likely to succeed in any environment, the court could not ignore the "powerful, consistent[,] and compelling" testimony of the educators with respect to James' educational needs, which uniformly opined that Shawnna was well-intentioned but too accommodating of James to the point of enabling his bad behaviors and choices. Ultimately, due to concerns regarding James' educational needs, the court found this factor weighed in favor of Vernon.

As with previous custody factors, Shawnna emphasizes her position as the children's primary caregiver and cites Vernon's history of alcoholism, lack of steady employment, and lack of future plans. She argues that it was easy for Vernon to focus on James' homework when he was not working full time and had the boys in his care for only two weekends per month. In contrast, she was teaching full time, had the boys with her for the majority of the time, and struggled to find time to help with their homework while her job required her to assist with extracurricular activities.

Therefore, she reasons, she accepted the teaching position in Columbus, which would not require any duties beyond simply teaching and allow her to focus on the children after school.

As we previously noted, we understand Shawnna's arguments, but she does not address the fact that her decisionmaking at times failed to hold James accountable and enabled his behavior. When James' school asked that he leave his cell phone at the office so he could not call Shawnna whenever he wanted, Shawnna bought him a second cell phone. When James would call Shawnna, she would pick him up from school, resulting in his missing additional classes and falling farther behind. When James failed sixth grade math, Vernon and the school arranged for him to work with a tutor to complete his work throughout the summer, but Shawnna was opposed to him doing so. Similarly, Shawnna objected to James staying inside during field day in order to complete his assignments and to James working with his teacher before school or during lunch to help him with his math assignments. In short, the school officials who testified did not believe that Shawnna was holding James accountable or "holding up her end of the deal." Shawnna's failure to hold James accountable and her move to a new community caused the district court great concern with respect to James' education, particularly because it resulted in his failing sixth grade and seventh grade math. This finding was not an abuse of discretion. We therefore find no merit to this argument.

Because we find that the district court's analysis of the applicable custody factors was not an abuse of discretion, the court also did not abuse its discretion in determining that the children's best interests would be served by placing their physical custody with Vernon.

CONCLUSION

We conclude that the district court did not abuse its discretion in finding that awarding custody of the parties' minor children to Vernon was in the children's best interests. We therefore affirm.

AFFIRMED.